## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL McKENNA, et al.,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.** | : | **NO. 07-CV-110** |

**DITTER, J.**                                                                 **September 30, 2008**

### MEMORANDUM AND ORDER

This case began with the Eagles' football division championship win in January 2005. The plaintiffs, Michael McKenna, his wife Beth McKenna, their son, Timothy, and Michael's sister, Patricia Sullivan, watched the game on television and then armed with two video cameras, left home to join a street revelry that they knew had already started and to confront the police. The Philadelphia police department had anticipated the merrymaking and had organized a special detail of officers to control the crowd.  Events of the evening ultimately led to Timothy's arrest. This lawsuit followed alleging claims of unlawful arrest, excessive force, and First Amendment violations by members of the police detail.

On September 14, 2007, following a five-day trial, the jury returned a verdict in favor of Timothy McKenna on one claim:  that he was arrested without probable cause.  He was awarded $150,000 in compensatory damages.  The jury found in favor of the defendants on all other claims raised.

Plaintiffs seek judgment as a matter of law, a trial on damages, and a new trial based on alleged trial errors.  I shall deny these requests.

### I.  Factual Background

On January 23, 2005, Officer Anthony Jericho, a Philadelphia highway patrol officer, and other highway patrol officers were assigned to Frankford and Cottman Avenues to prevent the

gathering crowd from escalating into a mob that might result in personal injuries or property damage. By 7:00 p.m., the crowd of thousands of people had become loud and unruly. One group tried to tip over a news van, others burned sports jerseys, many were intoxicated, and people were running around yelling and screaming. It had recently snowed and people began throwing snow balls and beer bottles at the police officers as they were trying to maintain control of the crowd.

By then, the plaintiffs had joined the festivities. They were in the middle of the fracas as the police were attempting to disperse the crowd. As Officer Jericho was trying to move the participants along, he was hit in the face with a snow ball. He did not see who threw the snow ball but walked in the direction from which it was thrown. When he approached the people at that location, he asked them to disperse. One of celebrants, Timothy McKenna, refused to move. The confrontation between Officer Jericho and Timothy escalated and Officer Jericho ultimately decided to arrest Timothy for disorderly conduct. When Officer Jericho attempted to grab Timothy they slipped in the snow, Jericho dropped his nightstick, and both men fell to the ground. Timothy refused to put his hands behind his back, so other officers assisted Officer Jericho in placing Timothy in handcuffs. Timothy was then escorted to a police van by Officer Jericho. Officer Jericho denied having any contact with Timothy's parents or aunt at the time of the arrest or anytime thereafter. Timothy was transported to the 15th District in a police van. Officer Jericho followed Timothy to the District and prepared the initial paperwork for his arrest before returning to the detail at Frankford and Cottman Avenues.

Sergeant Jonathan Josie said that he and other officers assisted Officer Jericho's arrest of Timothy McKenna. Consistent with their training and practice, the officers formed a "half-moon" around Officer Jericho and Timothy to protect them and to keep the crowd back during

the arrest.  Sergeant Josie testified that he did not strike any member of the crowd during the arrest or as he escorted Timothy to the waiting police van.  Sergeant Josie did use his baton to push back the crowd by holding each end.  His testimony concerning the circumstances of Timothy's arrest was consistent with the videotape of the incident offered by the plaintiffs at trial.

Sergeant Mark Stoots testified concerning the events at the 15th District headquarters after Timothy was brought there for processing.  Sergeant Stoots arrived at around 9:00 p.m.  The McKennas came in about an hour and a half later and created a scene, screaming and cursing and demanding to see their son.  Sergeant Stoots checked on Timothy and informed the McKennas that he was safe, had no complaints, and would be released after he was processed.

At this time, Michael McKenna was filming the events as they transpired with a video camera.  Sergeant Stoots testified that the McKennas were permitted to videotape in the common area of the District, but he asked Michael several times to stop filming through the window to the operations room.  Michael then gave the camera to his wife, Beth, who hid the camera under her jacket and continued to videotape.  Sergeant Stoots testified that the operations room was not a public area and videotaping of it created a security risk because of the persons, paperwork, and equipment located therein.  When Beth continued filming the operations room, Sergeant Stoots told the McKennas to remove the camera from the building or he would take it from them.  Sergeant Stoots also testified that he was not concerned with the tape of his conduct and believed the tape would be incriminating evidence of the McKennas' conduct toward the police.  Eventually, Sergeant Stoots and two officers escorted them from the building.  There was no physical contact.

Sergeant Stoots also testified that he did nothing to prolong the processing of Timothy's

arrest.  As a juvenile, Timothy could not be released from custody without his parents present.

Because he complained of injuries, Timothy had been taken by the police from the 15th District to

the hospital for evaluation and any necessary treatment.  His release was thereby delayed.

Michael, Beth, and Patricia were treated at the same hospital.  Beth and Michael remained at the

hospital waiting for Patricia after they were discharged and after Timothy was returned to the 15th

District.  They did so despite knowing that he could not be released until they returned to the

district and took custody of him.  Their decision further delayed Timothy's release.

This testimony is more than sufficient to support the jury's verdicts in this case.

Plaintiffs' version of the events of this evening is different in many respects.  Plaintiffs'

contend the gathering was orderly and there was no need for police intervention.  Plaintiffs' deny

any words were exchanged between Officer Jericho and Timothy.  Instead, they claim to have

been leaving the peaceful celebration in single file when Timothy was grabbed from behind and

arrested for no reason.  Michael McKenna claims to have been subjected to excessive force and

knocked to the ground by Sergeant Josie and another officer, John Doe.  Patricia Sullivan

testified she was struck on the arm by Officer Jericho with his nightstick causing her to fall and

injure her shoulder and elbow.  Patricia asserts this force was used to prevent her from

videotaping the arrest of Timothy McKenna.  Beth McKenna testified Officer Jericho struck her

in the upper torso region with his nightstick.

Plaintiffs further alleged that Sergeant Josie failed to supervise Officer Jericho properly at

the time of Timothy's arrest.  Plaintiffs claim they were prohibited from videotaping at the 15th

District by Sergeant Stoots in violation of their constitutional rights.  Finally, they assert the

conduct of these police officers that evening was motivated by the officers' intent to retaliate

against the plaintiffs because Michael had previously sued the Philadelphia Police Department

-4-

and because they were videotaping the conduct of the police that night.

## II.  Legal Standards

### A.  Judgment as a Matter of Law

It is well established that a party must make a motion under Rule 50(a) for a directed verdict during trial in order to move for judgment as a matter of law after trial.  FED. R. CIV. P. 50(a); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 183 (3d Cir. 1992).  Plaintiffs did not move for a directed verdict at trial, and therefore, have waived any challenge to the defenses presented based on the sufficiency of the evidence.

Moreover, judgment as a matter of law is appropriate only when "there is no legally sufficient evidentiary basis for a reasonable jury" to find in favor of the non-moving party.  FED. R. CIV. P. 50(a); *see also Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149-51 (2000); *Gomez v. Allegheny Health Servs.*, 71 F.3d 1079, 1083 (3d Cir. 1995).  If the record contains even "the minimum quantum of evidence from which a jury might reasonably afford relief," the verdict must be sustained.  *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691 (3d Cir. 1993) (quoting *Keith v. Truck Stops Corp.*, 909 F.2d 743, 745 (3d Cir. 1990)).  As will be discussed below, there was more than ample evidence to support the jury's verdict in this case.

### B.  Motion for a New Trial

Alternatively, the plaintiffs seek a new trial pursuant to Rule 59(a).  FED. R. CIV. P. 59(a). The district court may order a new trial "for any reason for which new trials have heretofore been granted in actions at law in the courts of the United States."  *Id.*  Rule 59(a) does not set forth specific grounds on which a court can grant a new trial, leaving the decision to the discretion of the district court.  *See Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992) (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)).

The scope of my discretion when adjudicating a Rule 59 motion depends on whether the motion is based on a prejudicial error of law or on a verdict alleged to be against the weight of the evidence. *See Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993). Here, the plaintiffs present both factual and legal claims.

When the basis of the motion involves a matter within the trial court's sound discretion, such as my evidentiary rulings or points of charge to the jury, I have wide latitude in deciding the motion. *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 921-22 (3d Cir. 1986); *see also Klein*, 992 F.2d at 1289-90. I must determine: (1) whether an error was in fact made; and (2) whether the error was so prejudicial that refusing a new trial would be inconsistent with substantial justice. *Bhaya v. Westinghouse Elec. Corp.,* 709 F. Supp. 600, 601 (E.D. Pa. 1989).

If the verdict is alleged to be against the weight of the evidence, however, my discretion to order a new trial is much narrower, *Klein*, 992 F.2d at 1290, and I shall not substitute my "judgment of the facts and the credibility of the witnesses for that of the jury," *Fineman v. Armstrong World Indus*., 980 F.2d 171, 211 (3d Cir. 1992) (quoting *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960)). Because a determination that a jury's verdict is against the weight of the evidence "effects a denigration of the jury system," such a motion should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. CONRAIL*, 926 F.2d 1344, 1352-53 (3d Cir. 1991) (citing *EEOC v. Del. Dep't Health*, 865 F.2d 1408, 1413 (3d Cir. 1988)). Moreover, when as in this case, the subject matter of the litigation is simple and within a layman's understanding, I have less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations. *Id*. at 1352; *see also Lind*, 278 F.2d at 90-91.

-6-

Plaintiffs' post-trial motions seek judgment as a matter of law, assessments of damages, and a new trial based upon alleged trial errors.  I turn now to their contentions.

### III.  Plaintiffs' Post-Trial Motions

**A.  "Uncontradicted" Evidence**

Plaintiffs first maintain that their testimony about the use of force was not contradicted and therefore they are entitled to judgment as a matter of law and a trial to assess their resulting damages.

They are wrong.  The jury was not required to accept their assertions whether or not there was testimony to the contrary.[1]

I told the members of the jury that all matters of credibility, that is believability, was for them.  The jury was instructed that how much reliability, truth, value, and weight should be given to the testimony of each witness was for it to decide.  Finally, I told the jurors, "You are not required to accept the testimony of any witness, even though it may be uncontradicted."  (N.T. 12-14, Sept. 14, 2007.)  There was no exception to that portion of my charge.

In fact, the plaintiffs' attorney, Brian Puricelli, Esquire, had submitted a point for charge which said:

> In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You are the sole judges of the credibility of the witnesses.  "Credibility" means whether a witness is worthy of belief.  You may believe everything a witness says or only a part of it or none of it.

(Doc. 21-2, p. 10.)[2]

---

[1] However, there was.

[2] For ease of reference and the sake of clarity, I shall refer to the filings in this case by the document number as assigned on the court docket.

Obviously the jurors rejected the plaintiffs' testimony that they were subjected to unreasonable force.  Even a cursory reading of the transcript explains why.

**B.  Excessive Force Claims**

Plaintiffs each claim that they were the victim of excessive force at the hands of Officer Jericho and/or Sergeant Josie.  Although their arguments vary in some respects, the essence of each claim is that my jury instructions were erroneous.

   1.  Timothy McKenna

Timothy asserts that the jury should have been instructed that if they found no probable cause to arrest, any force used was unreasonable as a matter of law.  He goes on to contend that because the jury found there was no probable cause for his arrest, he is now entitled to judgment as a matter of law on his excessive force claim.  He cites no case to support either proposition and is wrong on both.  All claims that law enforcement officers used excessive force in making an arrest should be analyzed under the reasonableness standard of the Fourth Amendment, including those where the arresting officer lacked probable cause.  *Jones v. Parmley,* 465 F.3d 46, 62 (2d Cir. 2006) (citing *Graham v. Connor,* 490 U.S. 386, 395 (1989)).

My instructions on the claims of excessive force were fashioned from the Third Circuit Court of Appeals Model Jury Instruction 4.9, 42 U.S.C. § 1983.  I told the jury to consider Officer Jericho's actions in light of the totality of the circumstances of that evening and determine if the force used was reasonable.  *Graham,* 490 U.S. at 395; *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).  Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  I have reviewed the record and I properly set forth the law on probable cause for arrest and the use of excessive force during an arrest.[3]

---

[3] The jury was instructed as follows:

Timothy McKenna's second assertion is that Officer Jericho, when he arrested him, used excessive force.  It is, therefore, important for you to understand, first of all, what we mean by arrest, its legal consequences, the rights and the duties, and the liabilities of the arresting officer and a person who is being arrested.

An arrest is a process by which a person is deprived of his liberty and brought within the control and custody of the law.  An arrest can be thought of as a taking, the seizing, the deterring - - the detaining of a person by a law enforcement officer.  It's the assumption of physical control over another person against that person's will and without that person's consent.

Inherent and fundamental in the concept of an arrest is force.  That force, which will be necessary for the arresting officer to take physical control over a prisoner, deprive that person of his or her liberty and bring him or her within the control and the custody of the law.

A person who is being arrested has no right to resist.  That means it is unlawful to impede an officer, to try to escape, to block him, to push him, strike him, or exert force against him.  In short, it is unlawful to make any effort to keep an officer from carrying out his lawful duties.

A police officer who is met by force is not required during the lawful performance of his duties to retreat, but he may use such force as may be reasonably necessary to take and keep custody of the person being arrested and to protect himself from bodily harm.  Even under appropriate circumstances not present in this case, that could mean the - - even the use of a gun.

Involved and accompanying that arrest may be four circumstances justifying an officer's use of force.  First, the surrounding facts and circumstances.  In other words, what was going on.

Second, the way the initial arrest was accomplished, and its need. [Third,] [w]hether or not there was need for the officer to defend himself from retaliatory force.

And finally, the fourth, it was necessary to maintain control and custody of the person being arrested.  An officer may use the same force to maintain custody that he was justified in using to make the arrest in the first place.

On the other hand, an officer is not privileged to use more force than is necessary to accomplish his lawful purpose.  If he does so, if he uses excessive force, he violates the Constitutional rights of the person being arrested.  In other words, although force may be necessary so that an arrest can be made, it must not unreasonable under the circumstances.

In determining whether an officer acted properly, you must take into account the situation in which the officer found himself, the necessity for immediate action, the other person's conduct, the nature of the offense charged or suspected, and the chances of escape or rescue unless certain means are employed.

Further, when the plaintiffs raised this objection at the close of jury instructions, I gave this additional instruction:

> One more thing about use of excessive force.  It is my recollection, but of course, it will be up to you, that there was testimony that the McKenna family were leaving a peaceful celebration in a line and that Timothy McKenna was grabbed out of that line by Officer Jericho.

> If there was no reason - - if that's what happened, if he was just grabbed out of line by Officer Jericho, that in itself, would be an excessive use of force.  So you can consider whether or not he was grabbed, and if so, that would be an excessive use of force.

(N.T. 42, Sept. 14, 2007.)

Timothy is also wrong in his assertion that I instructed the jury "if there was no probable cause then there could be no justification to use force against Tim McKenna."  He goes on to say, "The jury obviously did not hear the instruction or did not understand it by then, or ignored the law or instruction."  (Doc. 71, p. 7.)  He is correct that the jury did not hear such an instruction

---

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of a Monday morning quarterback.  Not every push, shove, not every striking, or holding violates the law.  The question is whether the officer acted with reasonable force.

In judging whether Officer Jericho did so or not, and this applies of course to Officer John Doe, the question is whether each of them acted reasonably in the use of force.

As to the claim of a violation of by Timothy McKenna of his civil rights arising out of his arrest, remember there are two questions, either one of which could establish liability on the part of Officer Jericho.

First, did Officer Jericho have probable cause to arrest Timothy McKenna?  Second, whether or not there was probable cause, did Officer Jericho use unreasonable force?  In this regard, remember what I told you about the burden of proof.

Here, the burden of proof rests upon Timothy McKenna.  First of all to prove that Officer Jericho did not have probable cause to arrest him, and secondly, to prove that Officer Jericho used unreasonable force.

(N.T. 15-21, Sept. 14, 2007.)

because that is not what I said.  Rather, I correctly instructed the jury to review the circumstances

surrounding the arrest in making its determination on excessive force, pointing out the plaintiffs'

version of the circumstances of Timothy's arrest.  Counsel's extra-sensory perception into the

thought processes of the jurors – or the lack thereof – does not provide grounds to set aside a

verdict.  This is especially true when, as here, there is every indication that the jury just flat out

did not believe what Timothy and his witnesses said about excessive force.

    2. <u>Beth McKenna</u>

 Beth McKenna contends the jury instructions were deficient because there was no

instruction on the use of deadly force.  This claim is also without merit.

    First, no such instruction was requested nor was there an objection to the charge given for

failing to include an instruction on deadly force.[4]

    Second, I did charge on excessive force and the jury found there was none so far as Beth

McKenna was concerned (or any other plaintiff, for that matter).  If there was no excessive force,

obviously there was no deadly force and the failure to charge on deadly force was not error.

    Third, no such instruction would have been justified by the facts of this case.  Beth

McKenna claimed that she was speared by Officer Jericho's nightstick and suffered a bruise on

the chest.  In his memorandum, this is how Mr. Puricelli recounts the event:

        Defendant Jericho struck Beth McKenna in the upper torso chest

---

[4] I did not conduct a charging conference immediately preceding my charge to the jury.  However, during a
conference with counsel after we had discussed scheduling, I asked, "Is it going to be necessary to talk to me before
you close?"  (N.T. 109, Sept. 13, 2007.)  On three other occasions during this conference I asked if there was
anything else counsel wanted.  Despite these opportunities, there was no request for a charge conference.  In
addition, I provided counsel with sufficient opportunity to object to the charge outside the hearing of the jury and
gave further instructions as requested by the plaintiffs. *See United States v. Tyler*, 281 F.3d 84, 101 (3d Cir. 2002).
It is not my practice to provide counsel with a copy of my charge, but we had discussed jury instructions during
conferences prior to trial and counsel agreed to follow the Third Circuit model instructions, which I did, although not
verbatim.

region with his nightstick, and this testimony was never rebutted by
a defendant.  Sgt. Josie admits being at the scene of the arrest,
participating in the arrest and only being to six fee [sic] away.  He
did not depute [sic] Beth McKenna [sic] testimony and admitted a
knight [sic] stick cannot be trusted [sic] into a person's chest.  Sgt
[sic] Joeys [sic] said he say [sic] none of the McKenna [sic] doing
anything wrong and did not recall them trying to get between
officer [sic] Jericho and he[sic] (Sgt [sic] Josie).  Defendant Josie
and Doe knocked Michael McKenna to the ground.  Josie admits
push [sic] the crown [sic] back and doing so with his knight [sic]
stick."

(Doc. 71, p. 3.)   By no stretch of the imagination could this be termed the use of deadly force.

     3.   <u>Michael McKenna and Patricia Sullivan</u>

     Michael McKenna and Patricia Sullivan also challenge my instruction on excessive force

as it relates to their claims.  They assert that "there [sic] jury was simply lead [sic] to believe that

if the force on Tim was ok, [sic] because he was being arrested, then it must be ok [sic] on

anyone else who may be nearby."  (Doc. 71, p. 13.)  This issue is without merit.

     My instruction was a correct explanation of the applicable law.  The jury was told to

evaluate the plaintiffs' allegations of excessive use of force by each of the officers at the scene by

considering whether the officers' conduct was reasonable under the facts and circumstances

known to the officers that evening.  (N.T. 22-23, Sept. 12, 2007.)  It was also clear from my

instructions and the verdict sheet that a separate determination was to be made as to each

plaintiff, in addition to Timothy, even though the standard was essentially the same.

**C.  First Amendment Claims**

     Plaintiffs claim that they were the victims of retaliation because Michael McKenna had

sued the City and because of their videotaping of police activity.

     To establish a First Amendment retaliation claim, the plaintiffs must show that (1) they

were engaged in activity protected by the First Amendment, (2) the government responded with

retaliation, and (3) the protected activity was the cause of the retaliation.  *Thomas v.*

*Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).  A defendant may defeat a claim of

retaliation by showing that he would have done whatever he did, when confronted by the

plaintiff's challenge, whether the plaintiff's activity was protected or not.  *Ambrose v. Twp. of*

*Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).

     1.  <u>Association and Retaliation</u>

     After I completed my charge to the jury, the plaintiffs' counsel objected contending that I

had "misstated all the plaintiff's case, particularly the association . . . claim, which is a First

Amendment protected activity and pled in the complaint.  We argued the delays, and just because

of video - - we argued the delay is because of who Michael is associated with, meaning the

father, family relationship."  (N.T. 39, Sept. 14, 2007.)  He went on:

> There's no, as I say, mention anywhere, about the association or
> charge or a verdict question, about association, and that they could
> award for a delay.  And we don't contend the delay was improper,
> as opposed to a delay, is misleading to the jury because they have
> to first, if the delay was improper, we contend that there was a
> delay, then the normal, and it could have gone six hours, that was
> the whole purpose of the case.  They could have gone to six hours.
> We don't contend they didn't hold him.  We're saying they delayed
> that for a motivating reason.

(N.T. 40.)

     Uncertain about basis of this objection, I asked for further explanation.

> THE COURT:  Are you saying - - are you saying that the
> association matter is a matter of the delay in the processing of
> Timothy McKenna?
>
> MR. PURICELLI:  Yes, not just - -

THE COURT:  - - not just the fact that they had been videoing, not
just because the father had filed a lawsuit, but because of who
Michael, himself, was, so the jury would be entitled to consider,
whether Timothy was held longer that ordinarily, whether properly
or improperly, merely because of who he was and who he was
related to.

(N.T. 40-41.)  No further instruction was requested or given on this point because the family

relationship was only important if Timothy's release was delayed because of Michael's suit

against the City or because of the videotaping, matters which I had already covered.  (N.T. 42.)

Plaintiffs now contend the instructions I had given were erroneous with regard to the claim

that their First Amendment rights were violated when Officer Jericho and Sergeant Stoots

retaliated against the plaintiffs for engaging in protected activities, i.e., videotaping the police and

filing a civil rights suit against the police department.  Plaintiffs claim that their engaging in these

protected activities caused Officer Jericho to use excessive force against the plaintiffs, arrest

Timothy, and delay the processing of Timothy's paperwork prolonging his detention and also

caused Sergeant Stoots to delay Timothy's paperwork and release.  (Doc. 71, pp. 14-17.)  Rather

than instruct the jury as proposed in plaintiffs' rambling, and barely comprehensible instructions,

(Doc. 21-3, pp. 35–36), I drafted my own instruction that accomplished the task in a manner that

the jury would understand and that accurately described the relevant law (N.T. 23-26, Sept. 14,

2007).[5]

---

[5] The jury was instructed as follows:

One of the assertions here is that there was retaliation.  The plaintiffs allege that the actions of
Officer Jericho and Sergeant Stoots on the evening of January 23rd, 2005 were motivated by the
Officers' intent to retaliate against the McKenna family and Patricia Sullivan because Michael
McKenna had filed a lawsuit against the police department, and because Michael McKenna and
Patricia Sullivan were videotaping the activities of that evening.

What does retaliate mean?  Retaliate generally means – it's generally defined as a return of like-
for-like or return of evil-for-evil.  To prove this claim, the plaintiffs must have shown you that they
were engaged in activity protected by the United States Constitution.  I instruct you that the

In his post-trial motions, Mr. Puricelli also contends I should have read another instruction he submitted about the denial of the McKennas' rights as a family to associate with each other and with Timothy by reason of the delay in Timothy's processing at the 15th District.  Of course, anything about Timothy's being the son of Michael and Beth and the nephew of Ms. Sullivan and their right to be with each other was only important if his release was delayed.  The jury decided it had not been.

Quite apart from that obvious fact, I did not read Mr. Puricelli's proposed charge because it confuses rather than informs and argues rather than explains.  While presenting both sides of a

---

plaintiff videotaping in a public setting is a protected activity, as is the filing of a lawsuit against a police department.

I also instruct you, however, that the videotaping inside the control room at a police headquarters is not a protected activity.

The plaintiffs, here, must establish that the protected activity was a substantial or motivating factor in the police officer's retaliatory action, if there was retaliation.  Here, the plaintiffs claim that Timothy would not have been arrested, and the processing of arrest would not have taken as long as it did if it were not for the intent of Officer Jericho and Sergeant Stoots to retaliate against them for the videotaping or pursuing a lawsuit.

Thus, to prevail in this claim against Officer Jericho, the plaintiffs must prove that Officer Jericho arrested Timothy because Officer Jericho knew and, for some unexplained, unarticulated reason, resented the fact that Michael McKenna had a lawsuit against the police department, or because the plaintiffs were videotaping the activities of that evening.

However, if you find that Officer Jericho had probable cause to arrest Timothy, and I've explained to you what probable cause means, you will – the plaintiffs cannot prevail on their retaliatory arrest claims so far as Officer Jericho is concerned.

The plaintiffs have a further claim about retaliation.  They claim that both Officer Jericho and Sergeant Stoots delayed the processing of Timothy's arrest paperwork because of the lawsuit or because of the videotaping.  On this claim, the plaintiff must have shown that either or [both] of these officers delayed the processing of Timothy's paperwork because Officer Jericho and/or Sergeant Stoots knew that Michael McKenna had a lawsuit against the police department and/or because the plaintiffs were videotaping the activities of that evening and that the actions of the police officers were motivated by this knowledge.

Officer Jericho and Sergeant Stoots defeat this claim if they have established that they would have taken the same action regardless of the fact that Michael McKenna was pursuing a lawsuit against a police department or that the plaintiff had been videotaping the activity of the evening.

(N.T.  23-26, Sept. 14, 2007.)

question may lay the groundwork for an instruction on the law, there was no balance in this point. Worst of all, it contains reference to matters not in evidence.  (Doc. 21-3, p. 37.)  I suppose I could have corrected its errors of grammar but under all the circumstances, it seemed easier to start afresh.  I therefore used my own words to describe the plaintiffs' claims that they were the victims of retaliation because of their videotaping and Michael McKenna's having brought a lawsuit against the City.  (N.T. 24-26, Sept. 14, 2007.)

With the same goal in mind, I crafted the verdict sheet to ask the jury to consider the arrest of Timothy and the excessive force claims of each plaintiff separately, and then to consider the delay in Timothy's release and whether any delay was motivated by the retaliatory intent of Officer Jericho and/or Sergeant Stoots.  The charge and verdict sheet accurately set forth the issues the jury was required to decide.

2.  Videotaping Activities

The plaintiffs now also object to my instruction that videotaping activities inside the operations room at the 15th District was not a constitutionally-protected activity.  As I understand the plaintiffs' argument, they concede that videotaping is not always a protected activity but they "were permitted under the First Amendment to video the arrest and processing of their son."[6]

---

[6] There were two videotapes of the events of this evening.  One was recorded by Patricia Sullivan and was only a partial recording of the events at Cottman and Frankford Avenues.  This videotape was played for the jury at trial.  The second videotape was recorded by Michael and Beth McKenna.  The second videotape was in the custody of the McKenna family but mysteriously disappeared prior to trial.

According to Michael McKenna, this recording contained vital evidence including the police swinging their batons, beating another young person, taking Timothy to the ground, the interactions with Sergeant Josie, and the events at the 15th District headquarters.  (N.T. 36, Sept. 11, 2007.)  It would have proved the plaintiffs' entire case.  (N.T. 37.)  The recording had such good footage that he kept it with him no matter where he went.  He just wanted to always keep it on his person.  (N.T. 42.)

Mr. McKenna showed it to Mr. Puricelli around Christmas time, 2006.  (N.T. 53.)  He then tried to get the video recording copied but learned it had to be formatted first by the camera.  (N.T. 36.)  Even the TV stations McKenna took the recording to could not copy it.  (N.T. 42.)  He left it and the camera in his car for a week and both were missing.  (N.T. 36.)  The car may have been left unlocked.  There was no damage to the car.  (N.T. 37.)  He did not report the theft of the camera and all the videos that were with it because felt he might have misplaced the camera or left it at a family member's house (N.T. 38), or the house of a friend (N.T. 45).

Instead, "[t]hey were stopped from engraining [sic] in that protected activity by a policy of defendant Sergeant Stoots, a personal policy that is contrary to the employer City's policy." (Doc. 71, p. 15.)  They ask that I find a constitutional violation based on a footnote in *Gilles v. Davis*, 427 F.3d 197, 212 n.14 (3d Cir. 2005), that mentions in *dicta* that videotaping or photographing by the police in the performance of their duties on public property *may* be a protected activity.

At the plaintiffs' request (and over the objection of the City), I gave an instruction in this case that videotaping in a public place was a protected activity, but I declined to extend that right to the secured area of the police district.  I am aware of no Third Circuit precedent that would even come close to requiring such a charge and the plaintiffs have provided none.[7]

---

McKenna testified:  "[I]t was actually missing right before, like around the Christmas time area, between the play[-]off games and stuff like that." (N.T. 36.)  He went to several places during the time period of January 23rd to the time it would have been or could have been stolen out of the vehicle.  (N.T. 38.)

Several questions, both on direct and cross-examination, referred to Mr. McKenna's deposition of April 12, 2007.  At that time, Mr. McKenna  explained that the video was stolen  "no more than four weeks ago."  (Michael McKenna Dep. 39-40, Apr. 12, 2007.)  Next, he testified that after trying to get it copied, he left it in the car and then it was gone.  It was maybe about six weeks ago.  (Michael McKenna Dep. 40.)  Finally, he did not "recall where or when or what place it got stolen at."  (Michael McKenna Dep. 41.)  In any event, he checked with family members and went into their houses looking for the recording.  (Michael McKenna Dep. 42.)  He went to a lot of places where he maybe could have taken it such as his brother's or mother's.  He had people looking out for it.  (Michael McKenna Dep. 42.)

Mrs. McKenna explained her efforts to have a copy of the video recording made.  It was around the time of the holidays and they took it with them to multiple places.  Normally they did not leave it in the car, but when they learned her mother-in-law would not be at a party, they returned the video camera to the car.  When the recording could not be found, she checked with the mechanic at the place where they had taken the car for an oil change and the restaurant where they had waited while the oil was being changed.  (N.T. 70, Sept. 12, 2007.)

In describing her continued search for the video, Mrs. McKenna was careful to let the jury know she checked with her Bible study group in case one of them had picked it up.  She even contacted five Catholic charitable organizations in case the video had wound up in one of the bags of clothes they were donating.  She and her husband checked with in-laws on both sides of the family and looked for it in their houses.  They even looked in strange places, including the freezer.  (N.T. 70-71.)

All this occurred after Mr. Puricelli saw the recording.  (N.T. 69.)

In summary, according to the McKennas, for about three months they kept a vital piece of evidence which they believed would prove their whole case in a car that was not always locked.   Somehow or other it may have wound up in someone else's house or even in their own freezer.  Or taken by a religious visitor.  Or been put in a bag of old clothes.  Who knows?

Indeed, sometimes life is stranger than fiction, sometimes almost unbelievably stranger.

[7] The plaintiffs raise an Equal Protection theory for the first time in their post-trial memorandum.  Citing *United States v. Taketa*, 923 F.3d 665, 677 (9th Cir. 1991), the plaintiffs assert that because "[v]ideotaping of suspects in public places, such as banks, does not violate the Fourth Amendment; the police may record what they normally may view with the naked eye."  (Doc. 71, p. 6.)  From that statement, the plaintiffs contend that all

-17-

The facts here are simple.  The plaintiffs were able to videotape activities in the public area of the police district, but when they began videotaping through the window into the operations room Sergeant Stoots told them it was not permitted.  Plaintiffs claim that they "were only videoing the police activity occurring at the time and involving their son, who was falsely arrested and subject to unreasonable force."  (Doc. 71, p. 16.)

Sergeant Stoots testified that the operations room is visible through a plexiglass window but is located behind a locked door.  (N.T. 193-94, Sept. 12, 2007.)  Timothy was not in the operations room at this time – he was in an adjacent room where juveniles were held separate from adults.  (N.T. 192-93.)  Sergeant Stoots explained that he did not permit videotaping of the operations room because it is within the police department; civilians, juveniles and undercover police officers are in that area; and paperwork, equipment and assignments are in the area.  (N.T. 194.)  As the sergeant explained, "to see it is one thing.  To make it a permanent record is something different."  (N.T. 236-37.)   I found that Sergeant Stoots had stated a reasonable grounds for not permitting taping of the operations room.  (N.T. 107, Sept. 13, 2007.)

Even if the plaintiffs had established this was a constitutionally-protected activity, Sergeant Stoots testified that he never allowed videotaping of the operations room.  This uncontradicted testimony is enough to defeat the charge of retaliation.  *Ambrose,* 303 F.3d at 493.  Morever, the jury rejected the plaintiffs' claims that Officer Jericho's and Sergeant Stoots' actions were motivated by an intent to retaliate against the plaintiffs.  Finally, qualified immunity would have protected Sergeant Stoots from liability because his conduct did not violate a clearly

---

videotaping of things visible to the naked eye is protected activity.  Therefore, Sergeant Stoots' "policy denied Equal Protection rights because if the Police can video what is exposed to the public (*Taketa*), so too can citizens, such as the McKennas."  (Doc. 71, p. 6.)  Plaintiffs fail to explain how warrant and privacy concerns under the Fourth Amendment relate to issues of free speech and retaliation under the First Amendment.  I too am lost for an explanation.

established statutory or constitutional right of which a reasonable person would have known. *Doe v. Groody*, 361 F.3d 232, 237 (3d Cir. 2004).

**D.  Jury Confusion**

Mr. Puricelli also contends that Question 27 on the verdict sheet was confusing to the jury because it used the term "improper delay" – so confusing that a new trial is in order.  I disagree.

Plaintiffs testified that after Timothy was arrested and taken to district headquarters for processing, his ultimate release was delayed by Sergeant Stoots for two reasons:  first, because he was the son of Michael McKenna who Sergeant Stoots knew was involved in a lawsuit against the City, and second, because the McKennas had tried to videotape the proceedings inside the district building.  In addition, the McKennas contended that Officer Jericho had caused Timothy's release because Beth McKenna and Patricia Sullivan had videotaped Timothy's arrest.

I therefore submitted to the jury these questions and instructions:

27.  Was there a [sic] improper delay in the processing of **Timothy McKenna's** arrest paperwork and release?

> **If your answer is YES, answer Question 28.  If NO, you have completed the verdict sheet.  Please proceed to the bottom and sign as directed.**

28**.**  Was the delay motivated by **Officer Jericho's** intent to retaliate against the plaintiffs?

> **If your answer is YES, answer Question 29.  If your answer is NO, answer Question 30.**

29.  Plaintiffs are entitled to damages in the amount of $_____.

30.  Was the delay motivated by **Sergeant Stoots'** intent to retaliate against the plaintiffs?

> **If your answer is YES, answer Question 31.**

-19-

31.  Plaintiffs are entitled to damages in the amount of $_____.

(Doc. 54, p.7.)

Prior to the jurors' retiring to deliberate, I gave them instructions about each of the questions on the verdict sheet.  As to these interrogatories, this is what I said:

> Was there an improper delay in the processing of Timothy McKenna's arrest paperwork and release?  Remember, again, the burden is upon him to prove there was.  And the answer to that is either yes, there was an improper delay or he has not.  So you either answer yes or no.
>
> If you answer question 27 yes, then you go to 28.  Was that delay motivated by an intent to retaliate against the plaintiff, either yes or no.  If ... your answer is yes, then you answer question 29.  If your answer to that question is no, then you go to question 30.  How much money – question 29, how much money is the plaintiff entitled to for the delay in the processing of Timothy's paperwork.
>
> Then question 30; we've been, up to this point, dealing with Timothy McKenna's paperwork and Officer Jericho's involvement in it.  Now, we turn to a question involving Sergeant Stoots.  Was the delay motivated by Sergeant Stoots['] intent to retaliate against the plaintiff, either yes or no.  If you answered yes, then you answer question 31, but, of course, if you answered no, you do not answer question 31, which deals with how much money damages are the plaintiffs entitled to receive for the delay on the part of Sergeant Stoots.

(N.T. 35-36, Sept. 14, 2007.)

When I had finished the charge, I met with counsel to see if there were any exceptions or requests for further instructions.  After taking a general exception to the charge and verdict sheet, Mr. Puricelli contended that the verdict sheet was misleading because it used the term improper delay.[8]

There was no request that I give the jury any further instruction.  Because the questions

---

[8] Mr. Puricelli's incoherent objection is recounted above at page 13.

concerning delay had used the word "retaliate," my instructions had used the word "retaliate," and I did not have the slightest idea then (or now) what Mr. Puricelli wanted me to do, I made no further comment to the jury about any delay or retaliation.

After the jurors had deliberated for several hours, they asked me to explain the meaning of the term "improper delay" as it was used in Question 27.  Counsel could not agree on a supplemental instruction – Mr. Puricelli wanted the word "improper" stricken while counsel for the City pointed out that there may have been a delay for any number of reasons and that only a retaliatory delay mattered.

This is what I told the jury:

> Question 27 is this, "Was there an improper delay in the processing of Timothy McKenna's paper work?"
>
> Improper here is referring to whether or not it was retaliation.  You have heard the claim that there was a delay in the paperwork because the officers wanted to retaliate against the McKenna's [sic] because first of all, there was a videotaping, and secondly, there was the matter of Michael McKenna bringing suit against the police department.  So that's what we're talking about there.
>
> Was there retaliation involved and was that the reason for the delay in the processing of Timothy McKenna's paperwork?

(N.T. 63, Sept. 14, 2007.)

After further deliberation, the jury determined there had been no improper delay and answered Question 27 in the negative.

That would seem to end the matter, but not so.

In his post-trial memorandum, Mr. Puricelli contends:

> The Jury asked for a dictionary . . . and the Jury wanted the dictionary to understand the meaning for the word "improper" in Question 27.  Effort was made to define the word, for the Jury, and

> without a dictionary, but Plaintiffs submit the harm by the confusing
> word was irreversible.  The Charge was so confused by the word
> "improper" that the Jury could not understand; thus, the Jury could
> not consider properly the First Amendment Count, because of the
> word "improper".  The word is also not an element under the jury
> instruction for the First Amendment Retaliation claim.  Thus, the
> Plaintiffs submit that because the Jury Instruct [sic] was framed to
> cause confusion, which confusion occurred, a new trial on the First
> Amendment retaliation claim should be granted.

(Doc. 71, pp. 21-22.)

Having explained twice to the jurors before they retired that the plaintiffs claimed that they were the victims of retaliatory delay and having explained again that the question about improper delay asked whether there was retaliatory delay, I am satisfied there was no confusion.  Moreover, plaintiffs did not object to the manner in which I answered the jury's question about the term improper delay, and even now do not say why it was wrong or what I should have said.

I refuse to grant a new trial on the basis of supposed jury confusion.  It would be improper to do so.

**E.  Supervisory Liability**

Plaintiffs contend they are entitled to a new trial because I failed to charge on supervisory liability and that force could not be used against a person who was merely videotaping an arrest.

As to the latter contention, there was no specific request for such an instruction and no exception for my failure to give one.  Moreover, I am satisfied that the instructions I did give made clear that videotaping of police activity in public places is a constitutionally-protected activity.  (N.T. 24, Sept. 14, 2007.)

It is true that counsel submitted a point for charge on supervisory liability.  Like his other requests, however, it is barely comprehensible and replete with nonsense and mistakes of

grammar.[9]  In addition, there was simply no evidence that Captain Kelly saw anything that Officer

Jericho did at the time of Timothy's arrest or that Sergeant Stoots had any reason to believe that

Officer Jericho was delaying Timothy's processing at district headquarters.

### IV.  Malicious Prosecution

Finally, Timothy asks that I reconsider my decision dismissing his malicious prosecution

claim with prejudice.  I decline to do so as I am satisfied that my decision was correct.  "A

prosecution without probable cause is not, in and of itself, a constitutional tort."  *DiBella v.

Borough of Beachwood*, 407 F.3d 599, 602 (3d Cir. 2005) (quoting *Gallo v. City of Philadelphia*,

161 F.2d 217, 222 (3d. Cir. 1998)).  Moreover, "attending one's trial is not a government seizure

in a 42 U.S.C. § 1983 malicious prosecution action for violation of the Fourth Amendment."  *Id.*

at 603.  Here, as in *DiBella*, Timothy's arrest resulted in the issuance of a citation and several

court appearances, facts insufficient to establish a seizure, and thus insufficient for a malicious

prosecution claim to be submitted to the jury.

Timothy McKenna also brought suit for malicious prosecution under state law.

Pennsylvania law requires proof of three elements: 1) the termination of the prior proceedings in

favor of he plaintiff; 2) the want of probable cause; and 3) malice.  Malice may consist of hatred

or ill will, as well as a reckless and oppressive disregard of a person's rights.

 Here, there is no question about the fact that the disorderly conduct charge against

---

[9] For example:" [Michael, Beth and Timothy McKenna and Patricia Sullivan] contends [sic] that [supervisor Sgt  stoops [sic] and/or Capt Kelly violated [Michael, Beth and Timothy McKenna [sic] and Patricia Sullivan's] federal rights, and that [Sgt stoops [sic] and Capt  Kelly] should be liable for [Andrew Jericho's and  Sgt stoops' [sic]] conduct."  (Doc. 21-3, p. 9.)  Or, "Thus, [Michael, Beth and Timothy McKenna and Patricia Sullivan's [sic] can show that [Sgt  stops [sic] and or Capt Kelly] caused the conduct if [Michael, Beth and Timothy McKenna and Patricia Sullivan's [sic] shows [sic] that [Andrew Jeky [sic] and/ or Sgt  stoops [sic]] violated [Michael, Beth and Timothy McKenna [sic] and Patricia Sullivan's] rights at [Sgt Stoops [sic] or Capt Kelly's] direction."  (Doc. 21-3, p. 10.)

Timothy was dismissed by the state court when Officer Jericho declined to drop the prosecution

and accept an apology (N.T. 136, Sept. 12, 2007), and that the jury found there was no probable

cause for Timothy's arrest.  I dismissed the claim of malicious prosecution because I concluded

there was no basis on which the jury could find malice.  It is true that a jury may infer malice from

the absence of probable cause where there is enough evidence to make it a submissible issue, for

example, if the prosecution was initiated for the collection of a debt, revenge, gain, or some other

private purpose.  *Curley v. Automobile Finance Co.,* 23 A.2d 28 (Pa. 1941).  Such an inference is

not required.  *Hubert v. Alta Life Insurance Co.,* 196 A. 513 (Pa. Super. 1936).  A plaintiff must

show that the criminal proceedings were initiated for some purpose other than bringing an

offender to justice.  *Neczypor v. Jacobs*, 169 A.2d 528, 531 (Pa. 1961).  Such purposes may

include the desire for private advantage, ill will or hostility, or where the accuser does not believe

in the guilt of the accused.  RESTATEMENT (SECOND) OF TORTS, § 668 (2008).

There was no evidence that Officer Jericho knew Timothy McKenna prior to the night in

question and Officer Jericho denied knowing any of the plaintiffs as well.  There was also no

testimony other than the speculation of the plaintiffs, that Office Jericho initiated the prosecution

out of any private purpose, hatred, or ill will; that he acted recklessly or oppressively; that

Timothy was arrested for any purpose other than because Officer Jericho believed Timothy was an

offender; that Timothy was detained for any period other than that which arose from his arrest; or

that the bringing of the charge caused any injury beyond that which came from his arrest.  In short,

there was no evidence, direct or circumstantial, which would have justified the jury finding

malice.

Having reconsidered the law and the evidence, I again conclude that the dismissal of the

malicious claim was proper.

## V. Conclusion

I have reviewed each of the plaintiffs' assertions.  I find none that would support a

judgment as a matter of law, a trial on damages, or a new trial.

For all the reasons I have discussed, the plaintiffs' motions are denied.  An appropriate

order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


**MICHAEL McKENNA, et al.,**            :            **CIVIL ACTION**
                                        :
            **v.**                      :
                                        :
**CITY OF PHILADELPHIA, et al.**        :            **NO. 07-CV-110**


**O R D E R**

        AND NOW, this     30th          day of September, 2008,  IT IS HEREBY ORDERED

that Plaintiffs' motions for judgment as a matter of law and/or for a new trial (Docs. 58 and 59)

are DENIED.


_____BY THE COURT:___

_____

_____/s/ J. William Ditter, Jr._____
_____J. WILLIAM DITTER, JR., S.J.